IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| UNICREDIT BANK AG, NEW YORK BRANCH, f/k/a BAYERISCHE HYPO- UND VEREINSBANK AG, as agent for THE BANK OF NEW YORK MELLON,<br><br>*Plaintiff,*<br><br>vs.<br><br>LISA JUE-THOMPSON, *et al.*,<br><br>*Defendants.* | Case No. 12-CV-2468-EFM |

**MEMORANDUM AND ORDER**

In this action, Plaintiff UniCredit Bank AG, New York Branch, formerly known as Bayerische Hypo-und Vereinsbank AG ("UniCredit"), seeks to enforce a securitized promissory note against Defendants Lisa Jue-Thompson and Rickey Thompson (collectively "Defendants"). This matter comes before the Court on Defendants' Motion to Dismiss Plaintiff's Amended Complaint (Doc. 9), which seeks dismissal for lack of subject-matter jurisdiction and for failure to state a claim upon which relief may be granted. For the reasons stated below, the Court grants Defendants' motion in part and denies the motion in part.

## I. Factual and Procedural Background[1]

Defendants Lisa Jue-Thompson and Rickey Thompson are individual residents of the State of California. Plaintiff UniCredit is a banking organization organized under the laws of the Federal Republic of Germany with its principal place of business in New York. UniCredit brought this action in its capacity as agent of The Bank of New York Mellon ("BONY") to enforce various loan agreements executed by Defendants.

**A. Defendants' Loan Documents**

On April 29, 2005, Defendant Lisa Jue-Thompson executed a Promissory Note in favor of Brooke Credit Corporation ("Brooke Credit")[2] for the benefit of People First Insurance Services, an insurance agency she operated. On the same date, Lisa Jue-Thompson executed an Agreement for Advancement of Loan ("Agreement for Advancement"), which governed Jue-Thompson's relationship with Brooke Credit. Lisa Jue-Thompson also executed a Commercial Security Agreement and Addendum ("Security Agreement"), which granted Brooke Credit a security interest in the assets of Jue-Thompson's insurance agency. Finally, Rickey Thompson executed a Guaranty to secure the loan extended to Lisa Jue-Thompson.

The Agreement for Advancement, Security Agreement, and Guaranty collectively constitute ancillary agreements ("Ancillary Agreements") to the Promissory Note. Defendants and Brooke Credit were the only parties to the Promissory Note and Ancillary Agreements (collectively, "Loan Documents"), which represented Loan Number 4516 in the principal amount of $485,227.99. Brooke Credit underwrote and made the loan in the State of Kansas.

---

[1] In accordance with the standards governing motions to dismiss under Fed. R. Civ. P. 12, all well-pleaded facts in the Complaint are assumed to be true to the extent they are not controverted by evidence presented by Defendants. The Court views the facts and the evidence in the light most favorable to Plaintiff.

[2] The record reflects that Brooke Credit Corporation changed its name to Aleritas in 2008.

## B. Securitization of Defendants' Indebtedness

Over a period of several years, Brooke Credit sponsored a number of securitizations. To proceed with such securitizations, Brooke Credit would sell groups of its loans to securitization companies in exchange for cash that the securitization company would raise by issuing Notes to investors. The securitization company would then engage a trustee to service and enforce the underlying loans, and to then administer payments to the Noteholders.

On December 1, 2005, Brooke Credit entered into a Sale and Servicing Agreement, under which Brooke Credit sold all of its rights in a group of loans to Brooke Securitization Company V ("Brooke Securitization" or "Issuer"). Defendants' Loan Documents were among the pool of loans sold to Brooke Securitization under the Sale and Servicing Agreement. To pay for this group of loans, Brooke Securitization issued a series of Notes (the "2005-2 Notes") to various investors in the market. UniCredit was one of these investors, acquiring 58.25% of the 2005-2 Notes.

Brooke Securitization issued the 2005-2 Notes pursuant to a Floating Rate Asset-Backed Notes Series 2005-2 Indenture (the "Indenture") between itself, as Issuer, and BONY, as Trustee. Pursuant to the Indenture, Brooke Securitization provided security for its obligation to pay the Notes. This security took the form of a first priority perfected security interest in virtually all of Brooke Securitization's assets, including all of its interest in the group of loans owned by Brooke Securitization (the "Asset Pool"). Defendants' Loan Documents were among the group of loans that Brooke Securitization pledged as security to pay the 2005-2 Notes. The security interest in the Asset Pool collateral was granted by Brooke Securitization to BONY, in its capacity as Indenture Trustee, to retain for the benefit of the holders of 2005-2 Notes.

In its capacity as Trustee under the Indenture, BONY was entitled to (1) collect funds generated by the collateral, including loans in the Asset Pool; (2) liquidate the collateral following an event of default under the Indenture or upon default of any underlying Loan Documents, holding the proceeds in trust for the holders of the 2005-2 Notes; and (3) take other measures to protect the collateral under the Indenture. On October 22, 2008, BONY executed a Power of Attorney, designating UniCredit as its agent with full power of substitution to take all actions with respect to the Trustee's rights and remedies under the Indenture, including the right to pursue collection on any collateral securing the 2005-2 Notes.

When Defendants' Loan Documents were sold from Brooke Credit to Brooke Securitization, and then transferred to BONY as Trustee, they were transferred by delivery of the Promissory Note and a one-page allonge. The allonge bore two signature endorsements; the first purporting to negotiate the Promissory Note from Brooke Credit to Brooke Securitization, and the second purporting to negotiate the Promissory Note from Brooke Securitization to BONY, as Indenture Trustee. It is unclear whether the allonge was attached to the Promissory Note or whether its chain of custody was limited to its signatories.

**C. Default Under the Loan and Securitization Agreements**

Plaintiff's Amended Complaint alleges that Defendant Jue-Thompson breached the Loan Documents by failing to make payments when due, rendering Loan Number 4397 in default. The Amended Complaint also alleges that Defendant Rickey Thompson has failed to honor his Guaranty upon default of the Loan Agreements. Accordingly, Plaintiff now seeks to collect the indebtedness by enforcing Rickey Thompson's Guaranty and by enforcing its security interest in the assets of Jue-Thompson's insurance agency.

The Amended Complaint additionally alleges that Brooke Securitization defaulted on its obligations as Issuer under the 2005-2 Notes by failing to remit payments to Noteholders when due. On October 9, 2008, UniCredit sent a letter to BONY, as Trustee, notifying it of Brooke Securitization's default and instructing BONY to demand full payment under the Notes' acceleration provision.

**D. The Brooke Bankrupcty and Initiation of the Present Action**

On October 28, 2008, Brooke Credit and related entities filed a petition for bankruptcy protection under Chapter 11 of the United States Bankruptcy Code.[3] On September 20, 2012, the bankruptcy court entered an Order permitting BONY and UniCredit, among others, to pursue the collateral of the securities without any further relief required from the bankruptcy court.

UniCredit sent a demand letter to Defendants on September 25, 2009. On July 24, 2012, UniCredit filed its original Complaint in this action, claiming the right and title to enforce the promissory Note and Ancillary Agreements. Following Defendants' first Motion to Dismiss (Doc. 5), UniCredit filed its Amended Complaint (Doc. 7), attaching the Sale and Servicing Agreement as evidence of standing. UniCredit asserts standing as an agent of BONY, arguing that the bankruptcy court's order gave BONY authority to enforce the Promissory Note and Ancillary Agreements, thereby rendering UniCredit a holder or person authorized to enforce the agreements under the Uniform Commercial Code.

---

[3] The bankruptcy petitions were filed in the United States Bankruptcy Court for the District of Kansas and were administratively consolidated under Case No. 08-22786.

## II. Standards

### A. Dismissal for Lack of Standing Under Rule 12(b)(1)

To bring a justiciable case in federal court, Article III of the Constitution requires the plaintiff to have standing to sue.[4] Standing is the determination of whether a specific person is the proper party to bring a matter before the courts for adjudication.[5] "Standing is analyzed under Fed. R. Civ. P. 12(b)(1) because a party's standing implicates subject matter jurisdiction."[6] Motions to dismiss under Rule 12(b)(1) generally take one of two forms: (1) a facial attack on the complaint's allegations as to the existence of subject matter jurisdiction, or (2) a challenge to the actual facts upon which subject matter jurisdiction is alleged.[7] There are three constitutional standing requirements: (1) the plaintiff must have suffered or will immanently suffer a direct injury, (2) the plaintiff must show that the injury is fairly traceable to the defendant's conduct, and (3) the plaintiff must show that a favorable federal court decision will redress the injury.[8]

### B. Dismissal for Failure to State a Claim Under Rule 12(b)(6)

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim for relief that is plausible on its face.'"[9] "[T]he mere metaphysical possibility that some plaintiff could prove some set of facts in support of the

---

[4] *See, e.g.*, *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992) ("[T]he core component of standing is an essential and unchanging part of the case-or-controversy requirement of Article III.").

[5] *See, e.g.*, *Allen v. Wright*, 468 U.S. 737, 750–51 (1984) (quoting *Warth v. Seldin*, 422 U.S. 490, 498 (1975) ("In essence the question of standing is whether the litigant is entitled to have the court decide the merits of the dispute or of the particular issues.")).

[6] *McCollum v. W. Elk Sch. Bd. No. 282*, 2013 WL 3967968, at *3 (D. Kan. Aug. 1, 2013).

[7] *Merrill Lynch Bus. Fin. Servs, Inc. v. Nudell*, 363 F.3d 1072, 1074 (10th Cir. 2004).

[8] *See Lujan*, 504 U.S. at 560–61 (citations omitted).

[9] *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

pleaded claims is insufficient; the complaint must give the court reason to believe that this plaintiff has a reasonable likelihood of mustering factual support for these claims."[10] "The court's function on a Rule 12(b)(6) motion is not to weigh potential evidence that the parties might present at trial, but to assess whether the plaintiff's complaint alone is legally sufficient to state a claim for which relief may be granted."[11] In determining whether a claim is facially plausible, the court must draw on its judicial experience and common sense.[12] All well-pleaded facts in the complaint are assumed to be true and are viewed in the light most favorable to the plaintiff.[13] Allegations that merely state legal conclusions, however, need not be accepted as true.[14]

### III. Analysis

**A. UniCredit Has Standing to Enforce the Promissory Note and Ancillary Agreements**

A party has standing to enforce a negotiable instrument if it is a "person entitled to enforce" the instrument, as defined in Article 3 of the Uniform Commercial Code.[15] A "person entitled to enforce" an instrument includes both a "holder" of the instrument as well as a "nonholder in possession of the instrument who has the rights of a holder."[16] Defendants argue, among other things, that Plaintiff lacks standing as a holder because the allonge effecting negotiation was not properly attached to the Promissory Note. While UniCredit does not

---

[10] *Ridge at Red Hawk, L.L.C. v. Schneider*, 493 F.3d 1174, 1177 (10th Cir. 2007).

[11] *Dubbs v. Head Start, Inc.*, 336 F.3d 1194, 1201 (10th Cir. 2003).

[12] *Iqbal*, 556 U.S. at 678.

[13] *See Zinermon v. Burch*, 494 U.S. 113, 118 (1990); *Swanson v. Bixler*, 750 F.2d 810, 813 (10th Cir. 1984).

[14] *See Hall v. Bellmon*, 935 F.2d 1106, 1110 (10th Cir. 1991).

[15] Kan. Stat. Ann. § 84-3-301.

[16] *Id.* This statutory provision includes additional bases for standing that are not relevant here. *See id.*

abandon its claimed status as holder, it argues that its more modest, alternatively-asserted status as a nonholder in possession of the instrument with the rights of a holder is independently sufficient to demonstrate standing.

A nonholder of an instrument can attain the rights of a holder in several ways, including a "transfer" of the instrument from a holder to the nonholder.[17] "Transfer of an instrument, whether or not the transfer is a negotiation, vests in the transferee any right of the transferor to enforce the instrument . . . ."[18] "An instrument is transferred when it is delivered by a person other than its issuer for the purpose of giving to the person receiving delivery the right to enforce the instrument."[19] The Permanent Editorial Board for the Uniform Commercial Code provided the following example regarding the circumstances in which delivery of a note constitutes a transfer:

> For example, assume that the payee of a note sells it to an assignee, intending to transfer all of the payee's rights to the note, but delivers the note to the assignee without indorsing it. The assignee will not qualify as a holder (because the note is still payable to the payee) but, because the transaction between the payee and the assignee qualifies as a transfer, the assignee now has all of the payee's rights to enforce the note and thereby qualifies as the person entitled to enforce it. Thus, the failure to obtain the indorsement of the payee does not prevent a person in possession of the note from being the person entitled to enforce it, but demonstrating that status is more difficult. This is because the person in possession of the note must also demonstrate the purpose of the delivery of the note to it in order to qualify as the person entitled to enforce.[20]

---

[17] Kan. Stat. Ann. § 84-3-203(b).

[18] *Id.*

[19] Kan. Stat. Ann. § 84-3-203(a).

[20] Report of the Permanent Editorial Board for the Uniform Commercial Code: Application of the Uniform Commercial Code to Selected Issues Relating to Mortgage Notes, 5-6 (Nov. 14, 2011) (available at http://www.ali.org/00021333/PEB%20Report%20-%20November%202011.pdf); *see In re Jackson*, 451 B.R. 24, 229-31 (E.D. Cal. 2011) (quoting the Report of the Permanent Editorial Board for the Uniform Commercial Code).

The Loan Documents in this case identified Brooke Credit as initial payee, and therefore, the original holder.[21] Brooke Credit then sold and transferred all of its rights in the Loan Documents to Brooke Securitization, delivering the original instrument and executing a complete assignment of all rights in the instrument pursuant to the Sale and Servicing Agreement. By virtue of this transfer, Brooke Securitization became a person entitled to enforce the Loan Documents without consideration of any allonge.[22]

Further, under the Indenture, Brooke Securitization granted BONY all of its rights to enforce loan obligations in the Asset Pool, including Defendants' Loan Documents. The Uniform Commercial Code applies to securitization transactions involving promissory notes, and an indenture trustee like BONY constitutes a "secured party" under Article 9.[23] By operation of the Power of Attorney, BONY granted UniCredit authority to exercise its rights to enforce the Loan Documents. Plaintiff's interest in Defendants' Loan Documents constitutes a "security interest" enforceable under Article 9.[24]

The Court finds that Brooke Securitization obtained the rights of a holder, namely Brooke Credit, through the transfer effected by the Sale and Servicing Agreement. Similarly, the Court must find that BONY obtained the rights of a holder, namely Brooke Credit and/or Brooke Securitization, by virtue of the transfer effected in the Indenture. By operation of the Power of Attorney, BONY authorized UniCredit to enforce all of its rights pertaining to the Loan Documents. For this reason, the Court finds that these transfers render Plaintiff UniCredit, at

---

[21] Kan. Stat. Ann. § 84-1-201(b)(21)(A).

[22] *See* Kan. Stat. Ann. § 84-3-203(b).

[23] *See* Kan. Stat. Ann. § 84-9-102(72)(E) (defining "secured party" as, among other things, "a trustee, indenture trustee, agent, collateral agent, or other representative in whose favor a security interest or agricultural lien is created or provided for.").

[24] *See* Kan. Stat. Ann. § 84-1-201(b)(35).

minimum, a "person entitled to enforce" the Loan Documents as a "nonholder in possession of the instrument who has the rights of a holder."[25]  Because Plaintiff has standing as a nonholder, the Court does not reach whether Plaintiff constitutes a holder or a holder in due course under the disputed allonge.  The parties may therefore proceed to engage in discovery concerning Plaintiff's status as a holder and other matters relevant to UniCredit's enforcement of the Loan Documents.  Defendants' motion to dismiss for lack of standing must be denied.[26]

**B.  Motion to Dismiss Plaintiff's Quantum Meruit Claim**

Plaintiff's fourth cause of action asserts a claim under quantum meruit.  Under Kansas law, the equitable claims of "quasi-contract," "unjust enrichment," and "quantum meruit" are often referenced interchangeably.[27]  To state a claim for quantum meruit, a plaintiff must allege that (1) a benefit was conferred upon the defendant by the plaintiff; (2) there was an appreciation or knowledge of the benefit by the defendant; and (3) there was an acceptance or retention by the defendant of the benefit under such circumstances as to make it inequitable for the defendant to retain the benefit without payment of its value.[28]  Defendants concede that they knowingly and voluntarily received a benefit in the form of the subject loan.  However, Defendants argue that Plaintiff's quantum meruit claim fails because the Amended Complaint does not allege that UniCredit personally and individually conferred any benefit upon Defendants.  In the Amended Complaint, UniCredit does not allege that it conferred any benefit upon Defendants.  The only benefit Defendants obtained was from Brooke Credit, which issued the underlying loan. UniCredit argues that by virtue of the similarities between Kansas and Texas quantum meruit

---

[25] Kan. Stat. Ann. § 84-3-301.

[26] *See UniCredit Bank AG, New York Branch v. Deborah R. Eastman, Inc.*, 2013 WL 237810, at *6-8 (D. Kan. Jan. 22, 2013).

[27] *See Dragon v. Vanguard Indus., Inc.*, 98 P.3d 908, 910 (Kan. 2004).

[28] *See, e.g., Mai v. Youtsey*, 646 P.2d 475, 479 (Kan. 1982).

elements, this court should adopt the reasoning of the Texas state appellate court in *McElroy v. Unifund CCR Partners*,[29] which allowed an assignee plaintiff to recover. This district has declined to adopt this interpretation of quantum meruit claims when Kansas courts have yet to adopt it.[30] Currently, Kansas law requires a plaintiff claiming quantum meruit to have conferred an actual benefit upon the defendant.[31] The Court therefore dismisses UniCredit's quantum meruit claim because the Amended Complaint does not allege any benefit conferred upon the defendants by UniCredit.

### C. Motion to Dismiss Plaintiff's Breach of Implied Covenant Claim

"The implied duty of good faith and fair dealing is part of every contract, so any violation of that duty is a breach of contract."[32] In order to prevail on an implied duty of good faith and fair dealing theory under Kansas law, the plaintiff must: (1) plead a cause of action for "breach of contract," not a separate cause of action for "breach of duty of good faith"; and (2) point to a term in the contract "which the defendant[ ] allegedly violated by failing to abide by the good faith spirit of that term."[33]

Here, Defendants argue that UniCredit fails to identify a specific contractual provision violated by Defendants' alleged breach of the duty of good faith. However, the Loan Agreements explicitly provide that in the event of default, the Borrower shall cooperate fully with Lender and transfer or deliver to Lender the Agency Assets that form the collateral of the

---

[29] 2008 WL 4355276 (Tex. App., 14th Dist. 2008).

[30] *Eastman*, 2013 WL 237810, at *7-8.

[31] *Id.* (citing *T.R. Inc. of Ashland v. Brandon*, 87 P.3d 331, 336 (Kan. Ct. App. 2004)).

[32] *Id.* (citing *Wayman v. Amoco Oil Co.*, 923 F. Supp. 1322, 1359 (D. Kan. 1996), *aff'd*, 145 F.3d 1347 (10th Cir. 1998)).

[33] *Id.* (quoting *Pizza Mgmt., Inc. v. Pizza Hut, Inc.*, 737 F. Supp. 1154, 1184 (D. Kan. 1990)).

Loan.[34] The Amended Complaint asserts that after their breach, Defendants failed to turn over commissions to UniCredit and interfered with Unicredit's possession of Defendants' collateral on the loan. UniCredit has established its standing to enforce the terms of the Loan Agreement in place of the Lender. The Court therefore finds that UniCredit fully identified the contractual provision relating to Defendants' breach of good faith, and therefore denies Defendants' motion to dismiss Plaintiff's breach of implied covenant claim.

**D. Motion to Dismiss Plaintiff's Conversion Claim**

The statute of limitations for conversion is two years.[35] Under the "discovery rule," a cause of action for conversion accrues when the "fact of injury becomes reasonably ascertainable to the injured party."[36] "A conversion may be based on the detention of possession from one who has the right to possess it."[37] One in possession of property who, on demand, refuses without proper qualification to surrender it to another entitled to its immediate possession is subject to liability for conversion.[38]

Here, Defendants argue that the statute of limitations began in September 2009, when UniCredit sent a letter to Defendants referencing their breach of the security agreement. Defendants argue that this is when the conversion became "reasonably ascertainable" to UniCredit under Kansas law. UniCredit argues that the conversion was not reasonably ascertainable until it sent a letter demanding the collateral in 2012. The Court agrees with UniCredit because the Loan Documents contemplate several steps before the Lender may

---

[34] *See* Advancement of Loan Agreement, Doc. 7-5, at 6.

[35] *Eastman*, 2013 WL 237810, at *8-9 (citing Kan. Stat. Ann. § 60–513(a)(2)).

[36] *Id.* (citing *N. Natural Gas Co. v. Nash Oil & Gas, Inc.*, 526 F.3d 626, 630 (10th Cir. 2008)).

[37] *Id.* (citing *Queen v. Lynch Jewelers, LLC*, 55 P.3d 914, 921–22 (Kan. App. 2002)).

[38] *Id.*

possess the collateral. In the Loan Agreement, Defendants agreed to grant, convey, and assign to the lender all right, title and interest in the agency's assets. However, the Loan Agreement states that actual possession of the Agency Assets "is deemed to occur when Lender or its agent notifies Borrower of default, Borrower fails to cure such default within the time allowed hereunder, and demands that the Agency Assets be transferred and paid directly to Lender."[39]

UniCredit's letter in September 2009 discussed Defendants' default on the Loan Documents for failure to pay. "This was just the first step contemplated by the Loan Agreement: notifying the Borrower of default."[40] UniCredit did not make its demand upon the collateral to the loan until 2012. Until this time, the conversion was not "reasonably ascertainable" by UniCredit.[41] The Court finds that the conversion claim was brought within the two-year statute of limitations.

**IT IS ACCORDINGLY ORDERED** that Defendants' Motion to Dismiss Plaintiff's Amended Complaint (Doc. 9) is **GRANTED IN PART AND DENIED IN PART**.

**IT IS SO ORDERED**.

Dated this 26th day of November, 2013.

ERIC F. MELGREN
UNITED STATES DISTRICT JUDGE

---

[39] Advancement of Loan Agreement, Doc. 7-5, at 5.

[40] *Eastman*, 2013 WL 237810, at *8-9.

[41] *See N. Natural Gas Co.*, 526 F.3d at 630.